### THE P. R. R. NO. 34 (four cases).

(District Court, S. D. New York. March 2, 1922.)

Collision ⚖️71(I)—Negligent handling of lines by contractor employing vessels held cause of injury to motorboats in slip.

> The colliding of a car float with four motorboats in a slip *held* due to the negligent handling of the lines of the car float, while it was being pushed farther into the slip by a tug bringing in another car float, and not to an excessive shove by the tug, so that the contractor, which had engaged the two car floats and directed the men who were handling the lines, was solely liable for the damages.

In Admiralty. Four separate libels, by Haakon Anderson, by Kristen Nielsen, by Iver Madsen, and by Thomas Anderson, against the steam tug P. R. R. No. 34, in which the claimant of the tug impleaded Di Giorgio & Co., Inc., under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi). Decrees rendered, dismissing the libels against the tug, and for the libelants against the impleaded respondent.

Decree affirmed 290 Fed. 844.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City (A. Howard Neely, of New York City, of counsel), for Pennsylvania R. Co.

James A. Fechtig, Jr., of New York City, for Di Giorgio & Co., Inc.

WARD, Circuit Judge. Four libels in rem were filed against P. R. R. tug No. 34 to recover damages to four small motorboats. The Pennsylvania Railroad Company, claimant, impleaded Di Giorgio &

Co., Inc., under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi), and the cases were tried together.

Di Giorgio & Co., Inc., a corporation engaged in the fruit business, had arranged for a berth on the north side of Pier 7, North River, for a steamer laden with bananas momentarily expected to arrive, and also for berths on the south side for an Erie Railroad float, with 10 empty refrigerator cars, and a Pennsylvania Railroad float, No. 62, with 10 empty refrigerator cars, into which they intended to load bananas from the steamer. Pier 7, a covered pier, is leased to the Erie Railroad Company, and Pier 6 is occupied by the city of New York, which charges wharfage for use of it. It is 570 feet long, the slip flaring outward, being at the bulkhead 93 feet wide and at the river end 160 feet wide.

May 17, 1920, at about 2 p. m., P. R. R. tug No. 34 arrived, with P. R. R. car float No. 62 on her starboard side, projecting, as usual, far beyond the tug. The tide was then running strong ebb. The only vessel lying on the south side of Pier 7 was the car float, Erie R. R. No. ——, also engaged by Di Giorgio & Co., Inc., some 50 feet from the river end. On the north side of Pier 6 there lay near the bulkhead a tier of three small, lightly built motorboats abreast in the following order: Comet, Roy, and Flirt—extending out about 32 feet. Next to them, nearer to the river end, lay the motorboat Chinook, of a beam about equal to the combined beams of the Comet and Roy. Next to the Chinook lay two tiers of canal boats, two abreast, and next to them a tier of three boats abreast, and last of all a canal boat with P. R. R. barge No. 407 outside of her, about 25 feet inside of Pier 6.

It will be seen that in this situation it was necessary to move the Erie float into the slip to give the Pennsylvania float a berth, each being nearly 300 feet long, and that tug No. 34 could not safely pass barge No. 407 with the float No. 62 alongside. Accordingly, her master hung up the float to the lower corner of Pier 7, and blew a signal to the pier to announce his arrival. Drake, the assistant manager of the fruit company, and in charge of the whole transaction, was in the office on the pier. He had employed one Henderson, with six longshoremen under him, in connection with the banana shipment in question. These men were at the time of No. 34's arrival taking ice out of the ventilators of the refrigerator cars. Drake had instructed Henderson that the P. R. R. float, when it came, should have the berth partly occupied by the Erie float.

In answer to the tug's signal, Henderson came out and told the master of the tug the float was to lie where the Erie float was, and that the tug should shove the Erie float further in. The master asked whether Henderson would attend to the Erie float's lines, who said he would. A water front strike was then going on, and there was no crew aboard the Erie float. The maneuver adopted was a simple and usual one, and merely required that the lines from the stern and bow of the Erie float to the pier should be rendered on the float as the tug pushed the P. R. R. float against her, two of Di Giorgio's men on the pier carrying the lines to bitts further up the slip.

The longshoremen on the float should have kept one turn around the bitts as the lines were rendering, but they did not, and the consequence was that the line from the bow first got away, the bow of the float sheering off from the pier, and that from the stern was then pulled out of the men's hands as the float moved in, one man losing a finger nail in the effort to hold it. The Erie float, under the influence of the ebb tide, sagged across the slip; her bow struck and sank the Chinook, and drove the Flirt on top of the Roy, causing her to sink also. In my opinion the negligence in handling the lines on the Erie float was the proximate cause of all that followed, and Di Giorgio & Co., Inc., is responsible because Henderson was directed by Drake, the assistant manager, who represented the company, to give the P. R. R. float her berth, and was engaged in so doing when the float got loose.

It is said by the libelants and by witnesses from Di Giorgio & Co., Inc., that tug 34 gave the Erie float a harder shove than usual. This, I think, is inferred from the extensive injuries to these four boats, and from a very vague statement that the float knocked a small piece of stone out of the bulkhead, and that her fender iron was damaged. But a large, heavy float with any momentum at all would crush these little lightly built pleasure boats like eggshells, and I do not believe the tug, whose engines were going at very slow speed, gave the Erie float any greater momentum than was needed to shove her in the slip. That the captains of the motorboats and some bystanders cried out to the tug to do something when they saw the Erie float sheer towards the motorboats was quite natural and does not indicate that the tug had given a very unusual shove.

It is also said that No. 34 should have had a checking line from the P. R. R. float to the Erie float, by which she could hold the Erie float back, if any emergency arose. I doubt whether such a line would have been of much use, because the ebb tide would have swung the bow across the slip, even if her momentum were reduced. If the float had kept alongside Pier 7, there would have been only about 25 to 30 feet of clear water between her and the motorboats. However, the use of such a line was a matter of judgment for the master of No. 34, and failure to use it does not make the claimant liable for the negligence of Di Giorgio & Co., Inc., an independent third party, whose intervention was the cause of what happened.

There will be a decree dismissing the libels against the P. R. R. tug No. 34, and for the libelants against Di Giorgio & Co., Inc.